COAETER, Judge.*
Seeing no reason to change the opinion I formerly gave in this case, I shall only add to it some few remarks on the broad ground taken in the second argument, and on the cases referred to for its support.
The objection made to the jurisdiction of the court in this case I am of opinion cannot be sustained. The assets in the hands of the appellant might be affected by his failure to take the course he has done; for if the court shall be of opinion that usury has been practised, the assets must be increased by half the amount at least of the usurious interest. Being then interested in this amount, and finding that the surviving partner, fearful of jeoparding his own credit, and that of his indorser’s, declines to take a measure calculated to benefit the estate, the appellant represents; and as it might be unjust and unreasonable, at a future day, to throw this loss on the surviving partner, because he failed to do an act tending perhaps to an immediate and greater injury, *even to the partnership itself; or an act which from his knowledge of the transaction, he.might have thought he could not in honor or in conscience do; the appellant was right not to risk this remote and more doubtful chance of doing justice to his intestate’s estate, and was therefore justified in pursuing the most effectual, and probably the only certain mode of securing it. The great question then is whether usury was practised or not.
The bill charges that on the 14th April 1811, Holloway & Hanserd, being greatly pressed for money, applied to the appellee Bruce for the loan of S3603 78, informing him of their distress; which they obtained at the unconscionable interest of 1 Yz per cent, per month, apd that in October of the same year, being as was known to the said Bruce, in increased distress, they applied for a loan of a further sum, which they obtained ata heavier rate, to wit, from 20 to 25 per cent, per annum.
The, defendant in his answer, denies that he ever had any money transactions with Holloway and Hanserd, or either of them, and that no communication for a loan ever passed between them or either of them and him. He admits he purchased five notes made by Holloway and Hanserd, three of them bearing date the 14th April 1811, payable in six, nine, and twelve months, without interest, and indorsed in blank by John Allison; and the other two bearing date the 7th October, in the same year, without interest, in nine and ten months, indorsed in like manner, by Thomas Atkinson. They *811 were all negotiable at the branch bank of Petersburg.
For the first three of 1400 dollars each, he gave 83628 80, and for the last two of 81205 each, he paid §2143 75.
The defendant further admits that he has occasionally purchased negotiable paper in market; believing that he violated no rule of law or morality thereby, and avers, that so far as he was concerned or acquainted with this '^transaction, it was a fair purchase of the notes and not a loan: and that with regard to the circumstances of Holloway and Hanserd, he had no jJarticular information. He expected the notes would be duly honored or he would not have bought them. He says he purchased them of John I/. Mertens, but whether he was the agent of Holloway and H. or not, and on what terms, he presumes are questions with which he has nothing to do.
The answer in this last particular was excepted to, “because under the charge of usury made in the bill, the plaintiff considers it highly important to ascertain, by the defendant’s answer, whether Mertens was the agent of H. & H., and whether the defendant made the bargain with him for the said notes in that character.”
The defendant amends his answer and says he doth not recollect or believe, that Mertens informed him that he was the broker or agent of H. & H. or either of them, or acting for them in the business; neither did he receive such information from any other quarter.
Thus stands the case upon the bill and answer. Every material allegation of the former, being denied in the latter, and consequently that must stand as true unless contradicted by the requisite countervailing proofs. It is true the defendant admits in his answer, that he received the notes at a discount which would be usury, if the transaction had taken place in consequence of a personal interview between him and the makers, as is alleged in the bill, whether a loan of money had been mentioned or not; there being no difference between the execution of a note before the money is advanced, and the pretended sale of that note by the maker at an usurious discount; and the execution of such note afterwards, in order to secure the money advanced with usurious interest. The former would be clearly a shift to evade the statute: it would be no answer for the party to say, *that there being nothing said about a loan he considered it a fair purchase of a note in market. He must know in the case supposed, that the note was given for no other consideration but that of the money so advanced: so too if the transaction had been between the known agent of the makers of the notes, acting for them in the negotiation, the same result must follow; but in this latter case, the knowledge in the purchaser of the agency must be acknowledged or proved, in order to put the case on the same ground of decision with one of an immediate communication between the parties :„and it was to extract an acknowledgment of this important fact, if it existed, that the exception to the answer was taken. I think it would have been more proper unless an immediate communication between the parties was still intended to be insisted upon, to have amended the bill charging this knowledge, and also charging the knowledge of facts, which might have led the defendant to suspect it, if the plaintiff supposed proof of a knowledge of suspicious circumstances was enough.
That there was a known agency in this case is denied ; and therefore had the case stood on bill and answer it must have been decided not to be an usurious transaction; unless the purchase of a negotiable bill, indorsed in blank, as this was, (the purchaser being ignorant that it was sold by the maker) at a discount greater than legal interest, be usury.
If a note of this kind is made and sent into market, say for the express purpose of being sold, and it is sold to A. at a discount not exceeding lawful interest, it is a good note in the hands of A. whether he purchase from a stranger, from the makers, or from their known agent. This is the situation of the most numerous class of notes negotiated at our banks, being made not on real transactions between maker and indorser, but for the accommodation of one or both of them. But suppose that A. af-terwards, being under the necessity of raising money, sends *this note into market again, still remaining indorsed in blank, and it is sold at a discount beyond lawful interest, this sale is not usury in the purchaser either as to the maker or holder. Or suppose A. sells his tobacco to his merchant B. on a credit, and receives in payment the note of B. given to C. and indorsed by him in blank, in payment. Say even that B. has such note in his possession, amounting only to the price agreed on for the tobacco, but made for the purpose of being sent into market, and finding he can purchase this crop of tobacco and would rather send that into market, delivers the note to A., such note executed after sale of the tobacco would surely be good in the hands of A. and so would that executed before, especially if the pHce of the tobacco had been fairly agreed on without reference to that note in particular, so as to shew that there was no usurious shift in relation to it. And if A. in either case sends such note into market, (indorsed in blank by C.) a purchaser of it, even from A. himself, at a discount greater than legal interest could not be deemed guilty of usury, even as to A. according to what I understand to be the uniform course of decision in this court, much less as to the maker and indorser.
Notes of this kind then, in the form which those in question bear, may be sold in market at a discount beyond legal interest, without subjecting the purchaser either to the odium or to the pains and penalties of usury. Had these notes been passed off by H. & H. dollar for dollar in payment of a debt contracted before or after their execution ; or discounted at 6 per cent, as before stated, they would have been good and binding on the makers. They were then not usurious and void when made, for if so' nothing afterwards can make them good. But like every thing else they were capable *812 of being the subject of an usurious contract made concerning them. Whether they have been the subject of such *contract is the question before us, and that must be proved as in all other contracts and cases of that nature.
Sales of property of this kind, to wit, notes, bonds, stock, or other money securities are generally effected, in large towns, by brokers. Persons who are not the owners and known not to be the owners of the property sold, but who act for the owner, and whose name from a prudential motive, is frequently withheld, and the transaction is perfectly fair and legal; and X can neither find any ^ase nor principle which would justify me in placing a sale made by such public agent, if he may be so called, on a ground different from one made by a private agent. All the sales above supposed might have been lawfully made by the public known broker, and under a direction too, to conceal the name of his principal.
There must be something then, beyond a bare purchase of a note of this kind, at a discount above legal interest, to stamp the transaction with the stain of usury, and in the case before us, according to the answer, the exception thereto, and the amended answer, (for the bill makes no specific charge on the subject,) the inquiry raised is, whether-these notes were or were not procured from the makers through the agency of a known agent, acting for them in the negotiation? The answer denies a knowledge of this agency; and to my mind there is no proof of such knowledge, which could have weighed a moment in a trial at law, much less to overthrow the defendant’s answer which until disproved must stand as testimony in the cause on the other side. If the answer was not sufficiently responsive it ought to have been excepted to. — In fact the bill makes no charge on this subject requiring a response, the exception puts the question on the ground of a known agency; the answer denies information of this agency, by the agent himself, and also that it was received from any other quarter, and nothing is charged or alleged from which such knowledge might be *inferred; if it was competent for the court to infer any thing so as to support the charge of the crime of usury.
If the plaintiff had other grounds than those resting on the knowledge of the agency whereon he could establish the charge of usury, he ought to have amended his bill, and charged those grounds, so that issue might have been taken thereon, and the party have the benefit of his answer or of his demurrer if he was not bound to answer. At present the case must rest on that point only; unless indeed as is above stated, the purchase however fairly made, was per se, usurious, being at a greater discount than legal interest.
It has been urged in argument, that the defendant under the circumstances disclosed in the testimony, had good grounds to suspect that he was in reality purchasing the notes from the makers, and not from a bona fide holder, and that if he was even ignorant, it was wilful ignorance, and he shall be as much criminated thereby as with actual knowledge.
By this, I understand is meant to be affirmed in the first place, that these grounds of suspicion, as they are called, amount to sufficient proof that he knew the fact in question; and secondly that if he did not know, he ought to have inquired, and not doing' so he is guilty of usury.
First, what are these circumstances, and are they sufficient to overthrow the" answer; or to establish the fact if the answer had been silent on the subject, and not excepted to?
The notes had on them the names of undoubted men, who probably would not themselves send them into market to be sold at a sacrifice. Agreed. But if they had been given by the merchants to planters for tobacco, and sent by the latter, or by any persons to whom the latter might have passed them into market, they would have remained in the same form in which they now are, if the seller did not wish to make himself responsible, and the purchaser *would have been satisfied, as in this case, with the indorsers. But the more the credit and caution is raised the greater would be the impression that the transaction was real. Would cautious men indorse for merchants whose circumstances were known to be such as described in the bill? Traders involved in pecuniary difficulties, who had become a prey to usurers.
The very standing of these indorsers was enough to satisfy any one not in the secrets of the leger, that this house was in good credit, and I have seen no proof in this cause, even now, to satisfy me as to their real condition, or whether they have wound up rich or poor. But merchants, since examined, say, that at that time, they were pressed for money, and because they knew it, Bruce, who responding to that part of the bill denies any particular information on that point, also knew it. A. purchases property to which B. has an equitable claim, it is proved that this equity was known to a great many of the neighbours of the seller and B. ; and it is also proved that A. residing at a distance, is well acquainted in that neighbourhood: will this charge A. with actual knowledge, especially when he denies it? Again, a house may be pressed for money and yet be able to purchase on credit, and give notes such as these in payment — at least as long as they can procure such indorsers as those on these notes. How then a-knowledge in Bruce of every thing that any witness (except Mer-tens who made no disclosure), says he knew, can effect this case I know not.
All the cases prove, that to constitute usury two wills must concur. It is not enough to prove circumstances known to one of the parties only, and which if known to both would show an assent in both to an usurious transaction. No one could with safety purchase property if he could be thus circumstanced, his money taken from him, heavy penalties and great odium incurred, when he, so far as he knew, was doing an act, not reprobated by the *law, but sanctioned by the uniform decisions of this'court.
In Hansborough v. Baylor, (a) the Judges *813 who gave opinions said, that the nature and substance of the transaction must be got at ■ — the views of the parties must be ascertained — an intention to borrow is not enough; there must also be an intention to lend, and if the purchaser of such paper be ignorant of the intention to borrow he cannot be considered a lender: both must agree to the usurious transaction. So in Gibson v. Fristoe, Judge Pendleton says, if it be a mere sale of property, and bonds are as much propert3' in this respect as an3 thing else, altho’ at an under value, it is not usury; but if the bargain proceeds from, or is connected with, a treaty for a loan it is.
Second. — But there were sufficient grounds of suspicion to excite inquiry, and therefore he is guilty. I see no reported case, or principle of decision to justify this doctrine. The general position is, that the will must concur; but for will we substitute ignorance, ignorance I will for the present admit, arising from negligence or fault, but still ignorance.
The party then is punished not for actual known usury, but for his culpable ignorance of facts, which if known, would have made him guilty of usury. It will not do to say that this wilful or culpable ignorance is knowledge of the fact. If the circumstances prove knowledge, then it is not ignorance of any kind. But the proposition is that culpable ignorance is to be considered equal to actual knowledge and punished accordingly. — This is dangerous ground to tread upon when we are about to inculpate a fellow-citizen.
By the wise humanity of our laws, every man is presumed to be innocent until the contrary appears. But who can say here what were the grounds of suspicion known to Bruce? There is a total absence of proof as to him of any knowledge of such facts — others knew facts and *we in the first place impute their knowledge to him, and then because that is sufficient to raise suspicion in our minds, we say he must have suspected also; for if he did not suspect tho’ others might, he is not guilty of a fault, be may be unfortunate in being unsuspicious but not criminal, I think we cannot convict of crime on such grounds as these.
But if suspicion in the party is to inculpate him as much as knowledge, ought not the bill to charge that fact, that the party might answer to it, as he has done as to his knowledge? And is not testimony to this point out of the issue? But what is this fault arising from a failure to inquire? If A. is about to purchase propert3 and has received such information of a prior equity in B. as would make an inquiry proper, he is bound to make it: why? because the other party is interested in asserting his claim and preventing the purchase. The reverse is the fact in the sale of notes. The seller is interested in concealing a fact which would exclude fair purchasers from the market, and would leave him a prey to usurers; and therefore a true state of the case could not be expected. Why then require such course to be pursued, unless some good will grow out of the establishment of the rule? And what good could result from establishing such a rule, when the party would be interested in withholding the truth, and might, by getting a friend as the holder, to take the note into market, or by a thousand other ways, elude the most diligent inquiry?
Nothing of this kind was held necessary in the case of Hansborough v. Baylor, in which case it appears the bond was made for sale, and not on a real transaction, but the purchaser there, as in this case, was ignorant of that fact.
Suppose we establish the rule that inquiry shall be made, and it shall turn out on inquiry, that the purchaser is told that the note is for a real transaction, and a fair *subject of purchase but in the trial the reverse is proved, would it be usury, unless it was proved that the purchaser knew this, and that the inquiry was a mere device and shift? To my mind such inquiry, unless made necessary, by this court, when the inevitable result would be, that the truth would be concealed, would be a strong circumstance to prove a device. But suppose the party believes the note is sold by the maker, when it is not, but is in fact a legal transaction, will this mistaken belief make it usury? That was not held to be enough in the case of Price v. Campbell.
I am therefore opposed to any rule which is to operate retrospectively, unless I can see that such rule is so well founded in reason and propriety, that its existence, as a rule of’correct conduct, may be supposed to exist previously in the minds of correct men, in regulating their transactions in life. I am the less disposed to do so, because this court in the above case has not hinted at such a necessity: and finally-, because unless we are now to exclude money securities from the market, because a bad1, use may frequently be made of them, I can-, see no good, no security, against the evil, which is likely to result from its adoption.
Any course which the legislature in its. wisdom may adopt, to exclude paper of this, kind from market, will only operate prospectively, and I therefore prefer leaving the subject to them.
Taking it at present, that paper of this, kind is a fair subject of traffic, but one which may be much abused, for the purpose-of eluding the statute against usury, I shall be ready on all fit occasions to lend my aid in preventing this abuse — farther I cannot go. I must take care, that in weeding the-tares, I do not destroy the wheat also.
For these reasons I was, formerly, for-affirming the decree; but a new argument has taken place, of which I shall take a brief notice.
*The broad ground now taken is, that where a note is indorsed for the-accommodation of the maker, in which case, the indorser having given no consideration for the note, could not maintain a suit against the maker, that such note can in no way be sold at a discount beyond legal interest, without subjecting the purchaser • to the penalties of usury, although he may have believed himself a fair purchaser of a note available in market — and it is alleged that some cases in New-York, and also some: *814 reported in Campbell, go this far, and that they have correctly settled the doctrine.
Jones v. Hake, is the hrst and leading case in New-York. There a note was sent by the maker to a money broker to raise money, after retaining it some time it was returned with a" declaration, that if the maker would get another name on it, to wit, that of P. S. he could get him the money at 2 per cent, per month. The name was obtained, and the note returned to Haskins the broker, who advanced part of the money, and afterwards the residue, but the agent of the maker in this transaction did not know whether Haskins was the owner of the money or acted as agent for another, but he knew no other person as the lender.
Haskins was offered as a witness to prove, that he as broker for the maker sold the note to Hermison at a discount not exceeding legal interest, and Hermison, who was released and not interested, was also offered to prove that he gave full value, and that there was no usury. They were both rejected — and the Judge directed the Jury, that they were to consider Haskins as the lender, and as illegal interest was taken by him, the note was void in its inception, and bad though in the hands of an innocent purchaser. The jury found, however, for the plaintiff and on a motion made for a new trial, two Judges were of opinion, that on the evidence admitted the instruction was correct; but that there was error in rejecting the witnesses, and that the case ought to be *tried on the whole evidence, considering Haskins as merely the agent of the maker and a competent witness.
The other two judges concurred that the witnesses were improperly rejected; but saw no ground for a new trial, for if Haskins was the agent of the maker, he was bound by his acts, and considering him in that relation only there is no proof of usury; the secret transactions between a principal and his agent, cannot influence the contract he makes for his principal with others. If all the Judges had concurred therefore, this case would only prove, that if the maker offers his note for discount, and it is discounted at usurious interest by the person to whom it is offered, it is usury — which is a principle I have admitted.
The case of Wilkie v. Roosevelt,(b) is precisely of this character. Marx & Co. the makers of the notes, were indebted to Goodrich the broker, and the note was taken from them by the latter, at a discount of 334 per cent, per month, and passed for full value to the plaintiff. It was there properly held, that Goodrich was the lender, and so the note being bad in its inception, could not be made good by being passed for full value to an innocent holder — a doctrine never disputed. However, even in this case, LEWIS, Chief Justice and LIVINGSTON dissented, though no opinion is reported as having been given by them.
The next case is that of Man v. the Commission Company. That case I understand to have been decided, on the point of usury in favour of the plaintiff. The Judges go on to lay down certain dicta, which seem broad in their character, it is true; but as they had no case before them to which those dicta coaid apply, and as the only authorities they refer to for them, were those of their own court above noticed, it is not to be presumed that they intended them to go beyond those cases, and if '*they did, I think those dicta are not only unsupported by, but contrary to all the leading doctrines here and elsewhere.
Indeed in this very case, they say, the principle is too well settled to be questioned, that a bill, free from usury in its concoction, may be sold at a discount below the legal rate of interest, and the reason is this: as the bill was free from usury between the immediate parties to it, no after transaction with another person, can as respects those parties invalidate it.
The case of Bennet v. Smith in the same book p. 3S7, was of this nature. There F. applied to H. to lend him money, he declined lending, but told him if he had any good notes he would buy. A few days after, F. brought notes executed by the defendants, which H. purchased at a discount of 21 per cent, but knew not as he said but that these notes were given to F. in the ordinary course of trade. A witness proved that F. applied to the defendants for a loan of their notes for $363: saying he had agreed with H. to sell notes to him at 21 per cent, discount.
This was held to be usury, and though broad doctrines are here also stated to have been settled in that court, yet this case might well be held to be one of usury. A loan was asked, it was shifted to a pretended purchase of paper, which the party had not then executed, the premium was agreed on and the paper soon after procured.
All the cases then in this court, were cases of usury in the inception, except one, and in that some broad dicta are thrown out, which, to the extent they are now said to go, are unsupported by any adjudged case.
The fallacy of the argument which goes to the full extent this case requires, it appears to me, must rest in this; not that a party fairly and innocently purchasing a note indorsed for the accommodation of the maker, is himself guilty of usury, and subject to the penalties of the statute, but that he is like the innocent purchaser of *a note — usurious in its inception between other parties. For how a man can be guilty of a crime, when his act may or may not be innocent according as facts shall turn out thereafter, and of which he is ignorant, I cannot imagine. For instance; suppose these notes, indorsed by Allison, were for accommodation, but those indorsed by Atkinson for full value, and both purchased at the same moment, and under the same circumstances; can it be possible that the transaction as to one shall turn out afterwards to be proper and legal, and that as to the other the penalties of the act shall be incurred?
But to avoid a note for usury the penalties of the act must be incurred by somebody : there is no avoiding it without guilt *815 somewhere. In the case put, though Allison, the indorser, would not have subjected himself to those penalties, nor would Mer-tens, the broker,—'Bruce must have done so, otherwise the note cannot be void. Could a jury, on a plea of not guilty, and the answer must at least be equal to such plea, find him guilty, and subject him to those penalties, on the evidence exhibited in this cause?
I think they surely could not: but suppose they could find, on those facts, that he knew' he was in reality purchasing an accommodation note from the maker himself, still that will not satisfy the doctrine contended for. According to that doctrine, they must find him guilty, although he knew no such thing, but on the contrary-believed he was doing what has been repeatedly sanctioned by this court. In other words they must find him guilty although they believe him to be innocent.
I shall not take a minute view of the cases in Campbell and the other cases cited, being satisfied, that they all turn on the ground that some person, in the original concoction of the note, has been guilty of a crime, and offence against the law, and although various circumstances, tending to prove that, will strike different minds in different ways, yet guilt must appear in the concoction *of the business, and must be brought home, by full proof, to some one originally concerned in it.
As to the recovery being limited to the sum given for the notes, I consider it not necessary to decide what would be the case as between the holder and his immediate indorsee, this suit being by the maker against the holder. As to him the notes are either bad for usury, or good in toto as it at present appears to me. Besides, if this be a good defence it will be open at law, and not concluded by the dismission of this bill.
The decree must therefore be affirmed and this case put to rest, though from the division of the court, the law in this important point is not settled. *

CabtuIjIj absent.

(a) 2 Munf. 86.

(b) 3d Johnson 66.

There is no clause in the law of New-York corresponding' with the penal section of our statute. It enacts that, “no person shall take directly or indirectly, for loan of monies, wares, &c. above the value of 71. for the forbearance of 1001. for one year, &c. ’ ’ adopting only part of the English statute, which was first enacted 21 Jac. 1, c. 17. The New-York statute, certainly does not in its terms involve the inquiry of the knowledge of either party that the statute is violated. And the particular provisions of the statute of Virginia, strongly negative such an opinion. As the law in this respect is still unsettled, a brief view of the successive statutes of England may be of public utility.
By the 27 Hen. 8, c. 9, § 2, no person shall sell merchandize, and within three months after, buy the same upon a lesser price, knowing them to be the same.
§ 3. No person by way of any corrupt bargain, loan, exchange, chevisance, shift, or interest, of any wares, or by any other deceitful way, shall take in gains for the forbearing of one year, for his money, or other thing, that shall be due for the same wares or other things, above 101. in the hundred.
§ 5. If any person shall do any thing contrary to this statute he shall forfeit the treble value; and shall suffer imprisonment, &c.
13 Eliz. c. 8. All bonds and assurances, in any thing against the act of 27 Hen. 8, c. 9, shall be void: and those violating it punished, &c.
21 Jac. 1. c. 17, was designed only to alter the rate as its preamble shews.
§ 2. No person shall take directly or indirectly for loan or any monies, wares. &c. above the value of 8 per cent, and all bonds, &c., for more shall be void. And every person who shall receive by way of corrupt bargain, loan, exchange, chevisance; or by *807 any deceitful ways or means, or by covin, or any deceitful conveyance. &c., more than 8 per cent, shall forfeit the treble valué.
Ih e 12 Car. II. c. 13, altered the rate to six per cent, and retained nearly the same words.
The 12 Ann c. 16, was nearly in the same words; but changing- the rate to 5 per cent.
From which statutes, it is manifest, that there was no distinction between the civil and the penal clauses in England, until the 21 Jac. I. and all the cases to shew the necessity of the corrupt agreement. were before the passage of that act.
The lirst statute made in Virginia on the subject of usury was in the year 1730, Geo. II. which fixed the. rate at 6 per cent, and is founded on the 21 ,iac. 1, which had been copied in all the subsequent acts of England. The same words are reiterated in the act of 1784, in that of 1748, which reduced the rate to 5 per cent, and with a few unimportant verbal variations, they are retained in all our acts since.
It is for our courts to say whether they will regard the statutes of Hen. 8. and 111Í7,. in the construction of an act. passed in Virginia in the reign of Geo. II. containing entirely different provisions; or whether they will look to the words of the act itself, as containing the real meaning of the legislature. Even in England recent decisions shew the corrupt agreement to be a mere form of pleading, and does not imply a knowledge in the party, that the contract is usurious. For this Marsh v Martindale, 3 Bos. & P. 158, is a clear authority. In that case the jury expressly found, that the plaintiff was innocent of the intention of violating the law, But Lord Alvanley says, that an agreement to take more than 5 per cent, is a corrupt agreement.. within the meaning of the act, whether the party think he acts contrary to the statute or not.— And that the agreement in this case was corrupt, whatever was the intention.
The Virginia statute having made an original distinction between the civil and penal clauses; using a number cf technical words implying collusion, and fraudulent agreement in the penal which are wholly omitted in the civil clause; the inference is strong, that the corrupt win is necessary to convict of an offence, but not to vitiate a contract altogether prohibited, with whatever intention it may be made, or whatever form it assume, so it be a loan, and more than 6 per cent, be reserved.— Edition 1821.